IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

D'Naie Jacobs,                              Case No. 17 CV 48

                           Plaintiff,       ORDER GRANTING
                                            SUMMARY JUDGMENT
              -vs-
                                            JUDGE JACK ZOUHARY
University of Toledo,

                           Defendant.


### INTRODUCTION

Plaintiff D'Naie Jacobs brings this action against her former employer, Defendant University of Toledo (UT), under Title IX, 20 U.S.C. § 1681 *et seq*. Jacobs claims UT unlawfully discriminated against her based on her sex. UT moves for summary judgment (Doc. 32). The Motion is fully briefed (Docs. 40, 47). Jacobs moves to strike certain evidence which UT filed with its Motion (Doc. 46). That, too, is fully briefed (Docs. 48–49).

### BACKGROUND

The following facts are undisputed unless otherwise noted. Jacobs began working for UT in 2007, where she continued to work in a variety of positions until July 2015. In January 2013, she was hired as Interim Dean of YouCollege, a new "portal college" designed to support student success and retention (Doc. 30-1 at 9; Doc. 38-1). In April 2014, she became Dean of YouCollege (Doc. 38-2). While serving in these positions, Jacobs reported to the Provost and Executive Vice President for Academic Affairs (*see* Doc. 30-1 at 9–11; Doc. 40-9 at 9). Scott Scarborough held this position when

Jacobs was hired as Interim Dean. John Barrett became Interim Provost shortly after she became Dean (Doc. 30-1 at 11).

During this time period, Jacobs was an at-will employee -- she could be terminated for any lawful reason, or for no reason at all, with sixty days' notice (*id.* at 11, 16). As Dean, Jacobs was the "chief administrative officer and academic leader" of YouCollege and was responsible for the "successful planning, organizing, policy development, implementation and direction of all aspects of the College" (*see* Doc. 38-1). She was also responsible for complying with UT policies and procedures (Doc. 38-1; Doc. 38-2).

### Investigation into YouCollege

Around January 2015, Jovita Thomas-Williams (Vice President of Human Resources) began receiving complaints from YouCollege staff about potential Family Educational Rights and Privacy Act (FERPA) violations, role confusion, and other work environment issues (Doc. 39 at 1; Doc. 39-1). Thomas-Williams and Barrett met with Jacobs to discuss the complaints and to inform her they were launching an investigation into YouCollege (Doc. 30-1 at 23–24; Doc. 39 at 1–2). Hoping the investigation would assist with issues she recognized, Jacobs initially welcomed the inquiry and encouraged her staff to be forthcoming (Doc. 30-1 at 24–26; Doc. 36-1 at 2).

Thomas-Williams assigned Melissa Studer (then Melissa Auberle) to lead the investigation (Doc. 36 at 1–2; Doc. 39 at 2). At that time, Studer was a Senior Human Resources Compliance Specialist, and she had extensive experience conducting workplace investigations at UT (Doc. 36 at 1). Studer and Thomas-Williams began the investigation by interviewing Jacobs (Doc. 31-1 at 8; Doc. 36 at 2). During the interview, Jacobs discussed her view of what was and was not working in YouCollege (*see* Doc. 30-1 at 26–30; Doc. 36 at 2).

Studer then interviewed sixteen other YouCollege staff members as well as Julie Fischer-Kinney (former Associate Dean of YouCollege). With input from Thomas-Williams, Studer drafted ten standard questions to guide the interviews (Doc. 36 at 2). Although Studer began each interview with these questions, she would also ask follow-up questions depending on the information disclosed (Doc. 31-1 at 8). Some YouCollege staff members brought documents with them to their interviews, and others sent Studer additional details via e-mail (Doc. 36 at 2). Many raised concerns about Jacobs, Crystal Taylor (Associate Dean of YouCollege), and two male Success Coaches (*see* Doc. 31-1 at 9; Doc. 36 at 2–3). Some suggested Jacobs should be terminated (Doc. 31-1 at 13). Studer prepared a "Climate Assessment" summarizing the information shared during the interviews and her findings (Doc. 36 at 2–3). Thomas-Williams reviewed a draft of the Climate Assessment and discussed Studer's findings with her before the Assessment was submitted in March 2015 (Doc. 39 at 2; *see also* Doc. 38-9).

**Climate Assessment Findings**

The reported purpose of the Climate Assessment was "to solicit feedback from members of the YouCollege team with regard to practices within the workplace . . . that influenced success in achieving the mission of YouCollege as well as behavior contributing to YouCollege team members feeling valued and evidence of an environment of fair and respectful treatment" (Doc. 38-9 at 2). It provided insights into three categories: organization, leadership oversight and support, and team dynamics.

The Assessment reported "several organizational issues impeding the success of YouCollege," including that "[s]taff is unclear of the roles and responsibilities of various YouCollege positions," "[t]here does not seem to be a strategic plan or vision for YouCollege," and "the staff does not feel that they can speak honestly and candidly around management" (*id.* at 2–3). Further, "[s]taff

3

members repeatedly stated that management does not follow the department's procedures," and "[a] number of staff members indicated that the budget is mismanaged" (*id.* at 3).

As for leadership oversight and support, "a number of staff members commented that they had not been properly onboarded when they began their positions at YouCollege" (*id.* at 4). This left them "unable to answer questions from staff and students" and without "the proper resources to complete projects" (*id.*). Other staff members reported that two male Success Coaches "routinely received preferential treatment from management" (*id.*).

The Assessment discussed "a number of conflicts" between Jacobs and the Success Coaches, Jacobs and Taylor, and Jacobs and other current and former YouCollege staff members (*id.* at 7–9). It reported that "Jacobs puts the Success Coaches in the middle of interpersonal issues between herself and Fischer-Kinney," and that she "does not model the behavior or follow the same rules she sets for the Success Coaches" (*id.* at 7). The Assessment also reported "numerous conflicts between Jacobs and Taylor (many of which have been aired publicly)" -- "[e]very staff member interviewed stated that the tension between Jacobs and Taylor [was] palpable" (*id.* at 9). Further, YouCollege staff disclosed that Jacobs demonstrated "a number of incidents of unprofessional behavior," including making "several discriminatory remarks" about students and potential job candidates (*id.* at 9–10).

The Assessment also found Jacobs violated a variety of UT policies and procedures, including: (1) UT's Confidentiality of Student Records policy and FERPA by sending probationary students letters "meant for other probationary students" and by "ask[ing] staff members to meet with probationary students prior to having received FERPA training," contrary to "standard practice" (*id.* at 6, 13); (2) UT's Access Control policy by "frequently g[iving] her [UT Account Domain] and password information to front desk students to work on projects on her behalf" (*id.*); (3) UT's Purchasing Card policy by "requir[ing] a front desk student to perform several tasks using her P-card"

(*id.*); (4) UT's Sexual Harassment and Other Forms of Harassment policy by making discriminatory remarks (*id.* at 9–10, 13); and (5) UT's Standards of Conduct policy by making other inappropriate comments (*id.*).

The Assessment concluded that "[t]he current YouCollege leadership is ineffective and is known to leverage bullying and fear tactics when interfacing with staff and students. Equally concerning is the fact that assessment interviews of YouCollege leadership and staff have highlighted that there is little or no respect between management and the staff" (*id.* at 13). Studer found that the work environment issues "contributed to retention challenges" and also "damaged working relationships with other UT colleges and departments" (*id.*). She recommended "[d]isciplinary action" for Jacobs and Taylor for their UT policy violations, and "strongly recommended" that the two male Success Coaches be "held accountable for their actions and unsatisfactory performance" (*id.*). She further recommended that a "clear" organization chart and plan be developed and communicated to YouCollege staff (*id.* at 14). Finally, she encouraged "a comprehensive compensation analysis for Success Coaches" to be completed "as soon as possible to ensure market competitiveness and proper internal equity for similar positions across" UT (*id.*).

Jacobs does not dispute that YouCollege staff members complained to HR, or that staff members disclosed to Studer the issues identified in the Climate Assessment. In fact, she testified during her deposition that "[HR] reported what they heard" and that YouCollege staff "provided their account" of what was happening (Doc. 30-1 at 52–53). But she contends HR "received one-sided information," and Studer "did not report on the complete picture" because the Climate Assessment excluded information Jacobs disclosed during her interview and provided to Nagi Naganathan (Interim President of UT) before the investigation (*id.* at 35, 51–53; Doc. 40 at 3–4). Jacobs also criticizes the Assessment for not being "an actual presentation of an assessment of the [C]ollege" like

5

Barrett and Thomas-Williams "insinuated it would be," but rather a report that "reveals 'dirt' on [her] in a conclusory fashion with little support" (Doc. 40 at 3).

### Response to the Climate Assessment and Pre-Disciplinary Hearing

After the Climate Assessment was submitted, Thomas-Williams discussed the results with Barrett (Doc. 39 at 2). They agreed to place Jacobs and Taylor on paid administrative leave pending pre-disciplinary hearings (*id.*). On March 12, 2015, Barrett and Thomas-Williams reviewed the results of the Climate Assessment with Jacobs, and she was placed on administrative leave effective immediately (Doc. 30-1 at 32, 35–36).

One week later, Jacobs, Taylor, and the two male Success Coaches were provided a formal pre-disciplinary hearing before Hearing Officer Megan Rayfield (Doc. 36 at 3; Doc. 39 at 2). At Jacobs' hearing, Studer presented the findings and conclusions of the Climate Assessment (Doc. 36 at 3); Jacobs responded with information she believed the Assessment missed or misreported (Doc. 30-1 at 37–39; *see* also Docs. 38-10, 38-11). On April 9, 2015, Rayfield submitted a Report confirming Jacobs violated several UT policies and procedures, and recommending she "be terminated effective immediately" (Doc. 38-12 at 21–22). Rayfield also recommended Taylor and the two male Success Coaches be terminated effective immediately (Docs. 36-6, 36-7, 36-8).

### Termination

Rather than terminate the four employees immediately, Thomas-Williams and Barrett decided to give them ninety days' notice (Doc. 36 at 3; Doc. 39 at 2). Jacobs was given notice on April 15, 2015. At her attorney's request, the notice was amended to indicate she was being terminated without cause (*see* Docs. 38-14, 38-15). Jacobs then requested a "name clearing hearing" (Doc. 39 at 3; *see also* Doc. 30-1 at 44). UT agreed to provide a public forum, but Jacobs declined to go forward with

the hearing (Doc. 30-1 at 44; Doc. 39 at 3). Her employment with UT terminated on July 14, 2015. Fischer-Kinney became Interim Dean of YouCollege (*see* Doc. 39 at 2).

**Terence Romer -- Non-Protected Employee Allegedly Treated More Favorably**

Around this same time, UT also investigated UT Registrar Terence Romer. UT decided to investigate Romer after receiving anonymous complaints in March 2015 about "a number of instances of unprofessional and inappropriate behavior over the past approximately one-year period" (Doc. 43 at 3; *see also* Doc. 36 at 3–4). Because some of the complaints raised possible Title IX violations, UT brought in outside counsel, Cheryl Wolff, to participate in the investigation with Studer (Doc. 36 at 3–4; *see also* Doc. 31-2 at 10). Romer was placed on administrative leave during the investigation (Doc. 36 at 4).

In late April 2015, Wolff drafted a Report summarizing their findings and the information disclosed by the thirteen witnesses interviewed, including Romer (Doc. 31-2 at 12; Doc. 43). The witnesses expressed concern about the appearance of a personal relationship between Romer and Jamie Daughten (the Associate Registrar), inadequate communication and poor staff relationships within the Registrar's office, retaliation from leadership, and possible FERPA violations (Doc. 43 at 16–17; *see also* Doc. 36 at 4). The Report noted that "[t]here was remarkable unanimity among witnesses in their concerns for the operations of the Registrar's office" (Doc. 43 at 16).

Although "[n]early every witness interviewed commented on the appearance of a personal relationship between [Romer] and Daughten," both Romer and Daughten denied dating or having a sexual relationship (*id.* at 17). The Report ultimately determined that there was "insufficient evidence" to conclude that such a relationship existed (*id.*). But it noted that the appearance of such a relationship had a "deleterious effect on the operations of the Registrar's office" and was "unprofessional" (*id.*). The Report further recognized that most witnesses "remarked on the lack of

communication by leadership in the Registrar's office" and poor staff relations (*id.* at 18). The Report concluded that Romer violated UT's Retaliation and Standards of Conduct policies, but concluded there was "insufficient evidence" from which the investigators could conclude that Romer violated FERPA (*id.* at 19).

Because of the "serious concerns reflected in this [R]eport," the investigators recommended that Romer not continue as Registrar (*id.*). But because Romer "br[ought] many technical skills to his work for the University," they suggested "it may be possible to utilize those skills in another position for which he is better suited" (*id.*). The Report "referred" the matter "to the University's Human Resources Officer and [Romer]'s supervisor for appropriate action" (*id.* at 20).

Romer voluntarily agreed to step down as Registrar before the investigation was completed, and was eventually transferred into the position of Director of Strategic Initiatives. In this position, he received the same rate of pay, but did not have any direct reports.

## MOTION TO STRIKE

Jacobs moves to strike the affidavit of Margaret Traband, the Vice Provost for Academic Affairs (Doc. 35), any reference to Traband in Thomas-Williams' affidavit (Doc. 39), and e-mails that "purportedly establish" Jacobs violated FERPA (Doc. 34). Jacobs argues Traband was never revealed as a witness (Doc. 46 at 1). She contends she is prejudiced by Traband's testimony because "UT asserts, for the first time, that Ms. Traband was the decision-maker to whom Plaintiff's male comparator, Terence Romer, allegedly reported to within the [U]niversity" (*id.* at 4), and that "Ms. Traband was the exclusive decision maker over Mr. Romer's lenient treatment with UT" (*id.* at 5).

UT responds that it never disclosed the name of Romer's supervisor to Jacobs because it "never believed that Mr. Romer is similarly situated to Ms. Jacobs" (Doc. 48 at 1–2). But it did "produce records regarding Mr. Romer that refer to Ms. Traband" and otherwise provided the

information in her affidavit through responses to written discovery requests (*id.* at 2). UT argues that the failure to list Traband did not prejudice Jacobs for these reasons and because UT "does not and has never claimed that Traband was the sole or exclusive decision maker" over the decision to transfer Romer (*id.* at 6). Further, UT contends that all the statements in Thomas-Williams' affidavit were based on her personal knowledge (*id.* at 7–8).

**E-mails**

Their admissibility is immaterial. This Court does not rely or consider them in deciding this case.

**Affidavits**

UT had a justifiable reason not to disclose Traband as a witness in its initial disclosures -- namely, it was not yet aware that Romer was a purported comparable employee. The dispositive question is whether UT complied with its duty to supplement. Federal Civil Rule 26(e)(1)(A) requires a party to supplement its disclosures "if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." If a party fails to do so, Federal Civil Rule 37(c)(1) calls for the exclusion of the information or witness "unless the failure was substantially justified or is harmless."

This Court finds that UT complied with its duty to supplement under Rule 26(e), and even if it did not, the failure was harmless. Contrary to Jacobs' assertions, UT does not contend that Traband was the *sole* decision maker involved in Romer's investigation or the decision to transfer him. Any such assertion would be inconsistent with UT's own admission that "Thomas-Williams was involved in the decision to transfer Mr. Romer" (Doc. 46-3 at 5), as well as Traband's averment that "*we* transferred Mr. Romer" (Doc. 35 at 2) (emphasis added). As for the fact that Romer reported to

Traband and Traband was involved in his investigation, this information was either "already made known," or UT's failure to supplement was harmless given the information available to Jacobs through other sources. For example, UT provided documents to Jacobs, which she relies on in her Opposition to Summary Judgment, which clearly reflect that she and Romer did not report to the same supervisor (*see* Doc. 40-9 at 9–10, 18–19). This Court also notes that Jacobs has not pointed to any written discovery request directly asking to whom Romer reported, or requesting the names of all those involved in the decision to transfer Romer.

In addition, Studer told Jacobs' counsel that she spoke with Traband during the course of Romer's investigation (Doc. 31-2 at 13). Her deposition testimony also discloses that Traband received complaints from Registrar employees and was the person who approached Romer to ask whether he was involved in a personal relationship with Daughten (*id.* at 12). Considering Jacobs' focus on UT's alleged deference to Romer during his investigation, her argument that she had "no reason to engage in further discovery" in light of this information is suspect (*see* Doc. 49 at 5).

Jacobs "cites no binding authority for the proposition that Rule 26(e) requires . . . an explicit statement [that a party intends to rely on a witness] and, in any event, this alleged deficiency would not change [this Court's] disposition of th[e] issue." *See Baker Hughes, Inc. v. S&S Chemical*, *LLC*, 836 F.3d 554, 568 (6th Cir. 2016). Further, while Traband's affidavit is certainly relevant, her testimony is not dispositive to resolving the Motion for Summary Judgment.

Finally, the Motion to Strike the references to Traband in Thomas-Williams' affidavit is denied for similar reasons. In addition, there is no evidence that Thomas-Williams made these statements by "improperly rel[ying] upon Ms. Traband's testimony" (Doc. 46 at 1), rather than her own knowledge as Vice President of Human Resources and her personal involvement in Romer's transfer.

*    *    *

**MOTION FOR SUMMARY JUDGMENT**

**STANDARD OF REVIEW**

Summary judgment is appropriate if there is "no genuine dispute as to any material fact," and the moving party "is entitled to judgment as a matter of law." Federal Civil Rule 56(a). When considering the Motion for Summary Judgment, this Court must draw all inferences from the record in the light most favorable to Jacobs. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). It may not weigh the evidence or make credibility judgments. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). But "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Expert Masonry, Inc. v. Boone Cty, Ky.*, 440 F.3d 336, 341 (6th Cir. 2006) (citation omitted).

**DISCUSSION**

Title IX prohibits entities receiving federal funds from discriminating on the basis of sex in education programs or activities. 20 U.S.C. § 1681; 34 C.F.R. pt. 106. Courts analyzing Title IX discrimination claims look to Title VII cases for guidance. *See, e.g.*, *Nelson v. Christian Bros. Univ.*, 226 F. App'x 448, 454 (6th Cir. 2007). Like Title VII claims, a plaintiff may establish a Title IX claim "either by introducing direct evidence of discrimination or by presenting circumstantial evidence that would support an inference of discrimination." *Laster v. City of Kalamazoo*, 746 F.3d 714, 726 (6th Cir. 2014). Jacobs argues she has done both.

**Direct Evidence**

"[I]f a plaintiff is able to produce direct evidence of discrimination, [s]he may prevail without proving all the elements of a prima facie case." *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511

11

(2002). "[D]irect evidence is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 926 (6th Cir. 1999). It "proves the existence of a fact without any inferences or presumptions." *Laderach v. U-Haul of Nw. Ohio*, 207 F.3d 825, 829 (6th Cir. 2000) (citation omitted). Although "[d]iscriminatory remarks by decision makers . . . can constitute direct evidence of discrimination," only "'the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of [gender],' satisfy this criteria." *Sharp v. Aker Plant Servs. Grp., Inc.*, 726 F.3d 789, 798 (6th Cir. 2013) (citations omitted).

Jacobs argues that comments allegedly made by Naganathan at the end of summer 2016, over a year after her termination, are direct evidence of discrimination because "they were still topically related to the decision to termination [sic]" (Doc. 40 at 10). At that time, Jacobs arranged a meeting with Naganathan to seek his advice about how to get another job (Doc. 30-1 at 45). She claims that during the meeting, he told her she "wore too many dark clothes" (*id.* at 58). She also contends that he "asked what [her] husband's position was," and then "insinuated" that "a woman should know her role if the husband has a more important position" through a story "describing the situation of himself" and his wife (*id.*). She could not recall his exact words (*id.*). She also alleges they "had conversations about what had happened to [her]," and she told him she believed it was "unfair" (*id.* at 45, 59). "[S]ome of [Naganathan's] response" was "that [she] never deserved [her] position" (*id.* at 45, 58). Naganathan did not explain why he believed this, but Jacobs "assume[d]" it was because she was a woman (*id.* at 59).

The only comment by Naganathan that was somewhat "topically related" to the decision to terminate Jacobs is his statement that she did not deserve her position. But as Jacobs admitted, Naganathan did not provide a reason for his belief -- her assumption that it was because of her sex is

not direct evidence of discrimination. Naganathan's comment about her clothes did not directly implicate her sex or her termination. And although she attempts to argue in her Opposition that Naganathan's isolated comment about gender roles was a direct statement and "not simply an 'insinuation'" (Doc. 40 at 10), this mischaracterizes her own deposition testimony (Doc. 30-1 at 45–46, 58–59). None of these comments "require the conclusion" that Jacobs' termination was motivated by her sex.

Further, Jacobs points to no evidence showing Naganathan played any significant role in the investigation of YouCollege or the decision to terminate her. Jacobs relies on a July 2013 policy to show that as Interim President, Naganathan had to make the final recommendation of termination to the Board of Trustees (*see* Doc. 40-7). But UT provides a July 2014 resolution showing his recommendation was not required (Doc. 47-1). Further, both Studer and Thomas-Williams aver that the decision to terminate Jacobs was made by Thomas-Williams and Barrett (Doc. 36 at 3; Doc. 39 at 2). And consistent with the July 2014 resolution, both the notice placing Jacobs on administrative leave and her notice of involuntary separation were signed by Thomas-Williams as an "Appointing Authority," with only Barrett copied in the communication (Doc. 38-7; Doc. 38-14). Jacobs recognizes as much in other filings with this Court.

Jacobs asserts that summary judgment should be denied because "prior to the publication of the Climate Assessment" and her termination, "Thomas-Williams provided a copy of the finished [Assessment] to Dr. Naganathan '*per his request*' and inquire[d] if he need[ed] anything further" (Doc. 40 at 10–11) (emphasis in original) (quoting Doc. 40-8). This e-mail was sent on April 2, 2015, weeks after the final Climate Assessment was submitted and presented at Jacobs' pre-disciplinary hearing. There is no evidence showing Naganathan had any contact with Studer or Thomas-Williams about the Climate Assessment before it was finalized, or with Hearing Officer Rayfield before she

issued her Report recommending Jacobs and the three other YouCollege employees be immediately terminated. Thomas-Williams avers that she "did not seek or receive input from anyone else regarding the draft report or recommendations of the Climate Assessment" (Doc. 39 at 2), and Studer testified at her deposition that she did not have any communication with Naganathan prior to the investigation and did not receive any input from him in drafting the Climate Assessment (Doc. 31-1 at 7, 13). Jacobs presents no evidence contradicting this sworn testimony.

At most, the April e-mail suggests that Naganathan became aware of the YouCollege investigation at some point before Jacobs was terminated -- it does not suggest when, or under what circumstances. Her "[c]onclusory statements unadorned with supporting facts" that Naganathan influenced or made the decision to terminate her "are insufficient to establish a factual dispute that will defeat summary judgment." *See Alexander v. CareSource*, 576 F.3d 551, 560 (6th Cir. 2009).

### Circumstantial Evidence

Circumstantial evidence can be used to raise an inference of discrimination by applying the burden shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Jacobs must first establish a prima facie case of discrimination by showing she (1) is a member of a protected class; (2) was terminated; (3) was qualified for the position; and (4) was replaced by a person outside the class, or was treated differently than similarly-situated, non-protected employees. *Braithwaite v. Timken Co.*, 258 F.3d 488, 493 (6th Cir. 2001).

If Jacobs can establish a prima facie case of discrimination, UT must articulate some legitimate, non-discriminatory reason for its action. *Id.* And if UT satisfies this burden, Jacobs must prove that UT's proffered reason was a pretext for discrimination. *Id.*

### *Prima Facie Case: Similarly Situated*

UT argues that even if Jacobs can establish the first three prongs of a prima facie case, she cannot establish the fourth prong: that she was replaced by a man or treated less favorably than a similarly-situated non-protected employee. It is undisputed that Jacobs was replaced by a woman. Jacobs therefore argues that Romer is a comparable non-protected employee who was treated more favorably by UT.

To satisfy the fourth prong of the prima facie case, a proposed comparator "need not be identical [to the plaintiff] in every way." *Tennial v. United Parcel Serv., Inc.*, 840 F.3d 292, 304 (6th Cir. 2016). But the plaintiff "must show that the comparator is similarly situated in all relevant aspects *and* has engaged in acts of comparable seriousness," but was disciplined differently. *Id.* (emphasis added). Courts must make an "independent determination as to the relevancy of a particular aspect of the plaintiff's employment status and that of the [comparator]" based on the particular facts and circumstances of the case. *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998).

Jacobs claims Romer is sufficiently similar to meet this standard because "[b]oth held positions of leadership, had nearly identical job duties, were both subject to at-will termination upon 90-days' notice, were employed under the same administration, and reported and answered to the same [P]rovost" (Doc. 40 at 13). But the documents Jacobs cites do not support several of these assertions. While both Jacobs and Romer held leadership positions, were at-will employees, and had *some* similar responsibilities, they also worked in different departments, in different roles, with different job duties (Doc. 40-9 at 18–19; *see also* Doc. 38-1). *See Campbell v. Hamilton County*, 23 F. App'x 318, 325 (6th Cir. 2001) ("Differences in job title and responsibilities, experience, and disciplinary history may establish that two employees are not similarly situated.").

Further, these documents, as well as other documents in the record, reflect that Jacobs and Romer reported to different supervisors -- Jacobs to Barrett (the Provost) (Doc. 40-9 at 9) and Romer either to the "VP of Operations" or Traband (Vice Provost of Academic Affairs) (*see id.* 18–19; *see also* Doc. 39 at 3). Although "the requirement that a plaintiff and her comparator 'must have dealt with the same supervisor' . . . does not automatically apply in every employment discrimination case," the factor is relevant under the circumstances of this case. *See McMillan v. Castro*, 405 F.3d 405, 414 (6th Cir. 2005). This is a case alleging differential disciplinary action, *see Ercegovich*, 154 F.3d at 352, and the unrebutted evidence shows that Jacobs and Romer's supervisors played key roles in the underlying investigation and disciplinary decision-making process (*see* Docs. 35, 36, 39; *see also* Doc. 30-1 at 23–24, 32–33, 36; Doc. 31-2 at 12–13; Doc. 43 at 20; Doc. 46-3 at 5).

In addition, Jacobs has not established that Romer engaged in, or was accused of engaging in, substantially similar conduct "without such differentiating or mitigating circumstances that would distinguish [his] conduct or [UT's] treatment of [him] for it." *Ercegovich*, 154 F.3d at 352 (citation omitted). In order for the conduct to be considered the "same conduct," it "must be similar in kind and severity." *Barry v. Noble Metal Processing, Inc.*, 276 F. App'x 477, 483 (6th Cir. 2008).

Even assuming *some* of Jacobs and Romer's misconduct was of similar severity, which UT disputes (Doc. 36 at 4; Doc. 39 at 3), it was different in kind. Based on YouCollege staff member complaints and interviews, the Climate Assessment found Jacobs violated several UT policies that were not implicated in Romer's investigation, including UT's Access Control and Purchasing Card policies. Further, YouCollege staff expressed concern that the budget of YouCollege was being mismanaged, and they reported significant confusion about reporting lines, the different roles of YouCollege staff members and leadership, and the College's overall strategic vision. Because Romer did not "allegedly engage[] in the range of activities for which [Jacobs] was disciplined," he was not

similarly situated.  *See Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555, 562 (6th Cir. 2004).  *See also Haughton v. Orchid Automation*, 206 F. App'x 524, 534 (6th Cir. 2006) (finding that plaintiff did not engage in substantially similar conduct with proposed comparator when "only some of their conduct was similar"); *Braithewaite*, 258 F.3d at 497.

Briefly, to the extent Jacobs argues her investigation itself was discriminatory, she fails to provide evidence creating a genuine dispute of material fact as to whether these differences were significant or impacted the ultimate decision to terminate Jacobs but transfer Romer.  First, the investigation arose under different circumstances.  One was an investigation of a College, the other of a specific individual.  The anonymous complaints against Romer also raised potential Title IX violations (Doc. 36 at 3–4; Doc. 39 at 3), whereas the complaints leading to the investigation of YouCollege did not (Doc. 31-2 at 20–21).  Both Thomas-Williams and Studer stated that it was standard procedure to bring in outside counsel to assist in investigating potential Title IX violations (Doc 36 at 3–4; Doc. 39 at 3).  Studer also testified that in Title IX investigations, the viewpoint of the party being investigated is more likely to be included (Doc. 31-2 at 20).  Jacobs does not rebut this testimony.  Second, although Studer was involved in both the Romer and Jacobs investigations, she did not draft the Report from Romer's investigation (Doc. 31-2 at 20).  Third, the little evidence presented concerning Romer's investigation shows that, although some of the key players may have been the same, others were not (*see* Docs. 35, 36, 39; *see also* Doc. 46-3 at 5).

Other unrebutted mitigating and differentiating circumstances include the fact that Romer voluntarily agreed to step down as Registrar before the investigatory process was completed (Doc. 31-1 at 18; Doc. 35 at 2), and that the Report from Romer's investigation recommended that UT find another position for him because he "brings many technical skills to his work for the University" (Doc. 43 at 19; *see also* Doc. 35 at 2; Doc. 46-3 at 6).  Although Jacobs notes in a footnote that she

17

once held the title of Director of Strategic Initiatives, she also recognizes that the position was "created" and "repackaged" for Romer (*see* Doc. 40 at 5 & n.2; Doc. 45 at 1). She does not argue, or present evidence suggesting she had all of the same experience and qualifications necessary to perform in the position as redesigned, or that Romer did not in fact have useful technical skills. *See Campbell*, 23 F. App'x at 325.

Jacobs presents insufficient evidence to create any genuine issue of material fact as to whether Romer was similarly situated or was treated differently for substantially similar conduct. Jacobs therefore fails to establish a prima facie case.

### Legitimate Non-discriminatory Reason and Pretext

Even assuming Jacobs established a prima facie case, she fails to demonstrate UT's proffered explanation is pretext for discrimination. UT has consistently asserted that Jacobs was terminated because an investigation into YouCollege revealed she engaged in a wide range of inappropriate conduct, failed to adequately manage her department, and violated numerous UT policies, as later confirmed by a hearing officer (*see* Doc. 37 at 21–22).

Jacobs may demonstrate pretext by showing UT's proffered reason either (1) had no basis in fact; (2) did not actually motivate the decision to terminate; or (3) was insufficient to warrant the decision to terminate. *Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1084 (6th Cir.1994), *overruled on other grounds*, *Gross v. FBL Financial Servs., Inc.*, 557 U.S. 167 (2009). Jacobs argues she has demonstrated pretext through all three methods (Doc. 40 at 20).

#### No Basis in Fact: Honest Belief Rule

Jacobs claims the Climate Assessment divulges "dirt" on her "in a conclusory fashion with little support" (Doc. 40 at 3–4). She takes issue with the fact that Studer "relies entirely on 'statements' from staff alone with little to no verification" and did not consult her "Strategic Plan for

18

the YouCollege," YouCollege's limited budget, or "the compensation of low-paid staff members" (*id.* at 3–4).

In response, UT invokes the honest belief rule. The honest belief rule provides that "as long as the employer honestly believed the reason it gave for its employment action, an employee is not able to establish pretext even if the employer's reason is ultimately found to be mistaken." *Ferrari v. Ford Motor Co.*, 826 F.3d 885, 895 (6th Cir. 2016). The employer's intent is what matters -- "arguing about the accuracy of the employer's assessment is a distraction because the question is not whether the employer's reasons for a decision are *right* but whether the employer's description of its reasons is *honest.*" *Smith v. Chrysler Corp.*, 155 F.3d 799, 806 (6th Cir. 1998) (emphasis in original) (internal quotation marks and citation omitted). To prove a belief is honestly held, "the employer must be able to establish its reasonable reliance on the particularized facts that were before it at the time the decision was made." *Ferrari*, 826 F.3d at 896 (citation omitted).

An employer establishes a factual basis for an employee's termination when it conducts an investigation, evaluates evidence, and collects witness testimony. *See, e.g.*, *Loyd v. Saint Joseph Mercy Oakland*, 766 F.3d 580, 591–92 (6th Cir. 2014); *Haughton v. Orchid Automation*, 206 F. App'x 524, 532–33 (6th Cir. 2006). Here, UT conducted an extensive investigation into YouCollege before terminating Jacobs. Studer interviewed eighteen witnesses, including Jacobs and all available YouCollege staff, before making the findings and recommendations outlined in the Climate Assessment. Studer avers that she "followed the same general procedure for the YouCollege investigation" as she followed in "[her] other investigations," and she "considered whether [witnesses] had any reason not to be truthful" (Doc. 36 at 3). Most of the witnesses interviewed "had consistent complaints or concerns about YouCollege" (*id.* at 2; *see also* Doc. 36-3; Doc. 31-1 at 8–

12). As discussed, Jacobs does not dispute that YouCollege staff members disclosed the issues outlined in the Climate Assessment (Doc. 30-1 at 35, 51–53).

There was also a pre-disciplinary hearing. At the hearing, Jacobs was presented with another opportunity to share her side of the story. After hearing from both Studer and Jacobs, the hearing officer confirmed the findings in the Climate Assessment and recommended that Jacobs be terminated immediately for cause (Doc. 38-12).

All of this evidence was before UT when it made the decision to terminate Jacobs. Jacobs does not point to any material evidence suggesting UT did not honestly believe she violated the policies identified in the Climate Assessment, or that YouCollege was not suffering due to mismanagement by its leadership. Further, her conclusory assertions that the Climate Assessment was inaccurate or incomplete are insufficient to avoid summary judgment. *See Haughton*, 206 F. App'x at 532–33.

Jacobs argues that even if the decision was informed, it was not "non-discriminatory" because of differences between her investigation and Romer's investigation. But although Jacobs identifies some minor differences in the way Romer's investigation was conducted and the way the resulting Report was drafted, as outlined above there were several distinguishing circumstances surrounding the two investigations. Her arguments also fail to take into account that UT relied not only on the recommendations of the Climate Assessment, but also the Report and Recommendation from the hearing officer. To the extent Jacobs argues the Climate Assessment was flawed because it did not contain or consider her version of the facts, she was subsequently provided several opportunities to remedy any such deficiency, both in writing and in person. *See Braithewaite*, 258 F.3d at 497. Though an investigation must be thorough enough for the employer's decision to be considered and reasonable, an employer is not required to conduct an investigation that is "optimal or le[aves] no

stone unturned." *Smith*, 155 F.3d at 807. Jacobs points to no error in her investigation, or any difference between the investigation of YouCollege and the investigation of Romer, that is "too obvious to be unintentional." *Id.*

### Did Not Actually Motivate: Naganathan's Post-Termination Comments

To establish pretext under the second method, "the plaintiff . . . acknowledges that [the alleged] conduct *could* motivate the dismissal, but attacks the employer's explanation 'by showing circumstances which tend to prove an illegal motivation was *more* likely than that offered by the defendant.'" *Smith v. Leggett Wire Co.*, 220 F.3d 752, 759 (6th Cir. 2000) (emphasis in original) (citation omitted). In other words, "the plaintiff argues that the sheer weight of the circumstantial evidence of discrimination makes it 'more likely than not' that the employer's explanation is a pretext, or coverup." *Id.* (citation omitted).

Jacobs' position seems to be based on either Naganathan's alleged comments during their meeting in late summer 2016 or her assertions that UT conducted her investigation in a discriminatory manner. Both arguments have already been addressed, and both are unavailing. Considering the context of Naganthan's comments and his limited involvement in Jacobs' termination, and taking into account the differentiating circumstances surrounding the investigations of YouCollege and Romer, neither provides a jury with a rational basis to find that UT's proffered reason for Jacobs' termination is untrue or that an illegal motivation was more likely.

### Insufficient to Motivate: Treatment of Romer Compared to Treatment of Jacobs

To establish pretext under the third method, Jacobs must produce "evidence that other employees, particularly employees not in the protected class, were not fired even though they engaged in substantially identical conduct to that which the employer contends motivated its discharge of the plaintiff." *Manzer*, 29 F.3d at 1084. The differences between Romer and Jacobs and their alleged

misconduct are discussed above. Further, the fact that three other YouCollege employees (a female and two males) were also terminated as a result of the Climate Assessment supports Studer and Thomas-Williams' averments that they viewed the issues in YouCollege as more significant and pervasive than the issues uncovered in the Registrar's office.

\* \* \*

Viewing the record in a light most favorable to Jacobs, she has produced insufficient evidence from which a jury could reasonably find in her favor. She has failed to produce more than a scintilla of evidence that Romer is a similarly situated non-protected employee, or that UT's proffered explanation for terminating her was mere pretext for discrimination.

### CONCLUSION

The Motion to Strike (Doc. 46) is denied; and the Motion for Summary Judgment (Doc. 32) is granted.

IT IS SO ORDERED.

_____s/ *Jack Zouhary*_____
JACK ZOUHARY
U. S. DISTRICT JUDGE

July 27, 2018